**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

DANIEL CRUZ,

    Plaintiff,

v.                                                      Case No. 3:18-cv-597-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

    Defendant.
_____/

## **MEMORANDUM OPINION AND ORDER**[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). Plaintiff alleges he became disabled on January 1, 2015. (Tr. 14.) A hearing was held before the assigned Administrative Law Judge ("ALJ") on March 2, 2017, at which Plaintiff was represented by counsel. (Tr. 28-51.) The ALJ found Plaintiff not disabled from January 1, 2015, the alleged disability onset date, through May 23, 2017, the date of the decision.[2] (Tr. 22.) Plaintiff has exhausted his available administrative remedies and the case is properly before the Court. Based on a

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 14.)

[2] Plaintiff had to establish disability on or before December 31, 2016, his date last insured, in order to be entitled to a period of disability and DIB. (Tr. 14.)

review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

   I.   **Standard**

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Discussion

Plaintiff argues that the ALJ erred by failing to account for Plaintiff's need for a service animal in her RFC findings and "since the ALJ did not include this fact in the RFC[,] there is no vocational evidence supporting the ALJ's step 4 determination that Plaintiff can return to his past jobs." (Doc. 16 at 4, 9.) Plaintiff urges the Court to remand for further administrative proceedings and a rehearing. (*Id.* at 12.) Defendant counters that the ALJ applied the correct legal standards and that her decision is supported by substantial evidence. (Doc. 17 at 14.) The Court finds that the ALJ's decision is not supported by substantial evidence, and, therefore, remands the case for further proceedings.

### A. Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own

medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue,* 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

4

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

When a claimant seeks to establish disability through his own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id*.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that his pain is disabling through objective medical evidence from an acceptable medical source that shows a medical impairment that could reasonably be expected to produce the pain or other symptoms, pursuant to 20 C.F.R. §§ 404.1529(a), 416.929(a), "all evidence

about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability," *Foote*, 67 F.3d at 1561. *See also* SSR 16-3p[1] (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms" to determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
. . .
In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[2] The determination or decision

---

[1] SSR 16-3p rescinded and superseded SSR 96-7p, eliminating the use of the term "credibility," and clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

[2] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping

6

> must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
>
> . . .
>
> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed" will also be considered "when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities." *Id.* "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the adjudicator] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* However, the adjudicator "will not find an individual's

---

on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

7

symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." *Id.* In considering an individual's treatment history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her stressors;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

### B. The ALJ's Decision

At step one of the five-step sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2015. (Tr. 16.) At step two, the ALJ found that Plaintiff

---

[3] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

had the following severe impairments: anxiety, depression, and post-traumatic stress disorder (PTSD). (Tr. 16.) At step three, the ALJ found that Plaintiff did not "have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments . . . ." (Tr. 17.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels[,] but with the following non[-]exertional limitations":

> [T]he claimant can understand and remember both simple and detailed instructions, and can follow 2-3 step commands. He is able to persist and maintain attention and concentration for two-hour increments sufficiently enough to complete an 8-hour workday. The claimant would function best in an environment with minimal social interaction with the general public, coworkers, and a supportive management style. He can make reasonable decisions and can adapt to routine changes in a workplace.

(Tr. 18-19.) In making this finding, the ALJ considered Plaintiff's subjective complaints, objective medical evidence, opinion evidence, and medical treatment records. (Tr. 19-21.) The ALJ considered Plaintiff's testimony that:

> His emotional problems began in 2012 when he discovered his father-in-law had molested his son. The claimant stated that his father-in-law confronted claimant's family with a gun, and the claimant had to shoot and kill his father[-]in[-]law in self-defense. Since then, the claimant stated that he sees his father-in-law's face all the time, and has nightmares and flashbacks. The claimant stated he is hypervigilant and has to be with his kids all the time to protect them. The claimant testified that he last worked in 2015, and had to leave because he would have breakdowns at work. He stated he has trouble working around others. In his adult function report, the claimant stated that he cannot control his emotions at work, and has cried at his job sites (Exhibit 4E).

9

(Tr. 19.) The ALJ also found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.*) The ALJ recognized that Plaintiff's impairments and symptoms affected his ability to work but "only to the extent they [could] reasonably be accepted as consistent with the objective medical and other evidence." (*Id.*)

The ALJ also concluded that the record supported "some mental limitations due to Plaintiff's depression, anxiety, and PTSD, but not to the extent that would preclude [Plaintiff] from performing all work." (Tr. 20.) The ALJ also noted that although Plaintiff's medical treatments for his mental impairments did not start until April 27, 2015, when he was diagnosed with PSTD, anxiety, and depression, "[Plaintiff] stated that his mental impairments stemmed from an incident in 2012 when he fatally shot his father-in-law in self-defense." (*Id.*) The ALJ further noted that:

> The claimant stated that he became unable to function adequately in the workplace, stating that if a boss or superior asked him to get [them] something, he would have flashbacks of his own stepfather commanding him to do something and that he would ostensibly react in an emotionally unstable manner (Exhibit 1F/6). The claimant stated he is fearful that his father-in-law's family is looking to harm him. He stated that he is constantly on edge [] and prone to bouts of crying. He last worked for a construction company in March 2015, and was only able to hold the position for a week because he was unable to control his mood related problems. The claimant also has a felony history as a sex offender, and had to participate in a weekly

> sex offender group from the age of 17 to age 27. He stated that he
> tends to avoid social situations and is unable to participate in sports
> activities with his children due to his status as a sex offender. During
> a September 2015 consultative examination, the examiner noted
> that the claimant had a depressed mood.

(*Id.*) The ALJ then referred to a mental status evaluation finding that:

> [Plaintiff] had good eye contact, was cooperative and motivated, was
> able to complete single and multistep commands without difficulty,
> had mild limitations in recent and remote memory, had clear and
> articulate speech, his thought process was clear and logical, and his
> attention and concentration was within normal limits (Exhibit 1F/6).

(*Id.*) The ALJ found that this mental status evaluation, which indicated that Plaintiff had "normal attention and concentration and only mildly impaired memory," supported the ALJ's determination that "despite some depression and PTSD, [Plaintiff] still had the mental capacity to perform some work-related activities." (*Id.*)

The ALJ also noted that more recent treatment records showed that Plaintiff's "mental impairments [could] be controlled with medication" and that, "with medication compliance, his mood and symptoms [could] be controlled." (*Id.*) The ALJ pointed to a February 2016 examination record, noting that Plaintiff "was not currently a danger to himself or others, and [was] stable for ongoing outpatient management," and also to a June 2016 examination record, noting that Plaintiff "was cooperative, calm, pleasant, had intact cognition, had normal recent and remote memory, and had fair insight and judgment." (*Id.*) The ALJ then noted that Plaintiff was "undergoing therapy for his mental impairments, and

11

was given an emotional support dog."[4] (Tr. 20-21.) The ALJ determined that the medical examinations also showed that Plaintiff had "mostly normal cognitive functioning and that his mental health symptoms [could] be controlled with medication compliance" such that, "despite Plaintiff's history of depression, anxiety, and PTSD, he still ha[d] the mental capacity to perform some work-related activities." (Tr. 21.) The ALJ then found that Plaintiff was able to engage in "a wide range of activities of daily living such as driving, taking care of his kids, and taking his family on vacation."

With respect to the opinion evidence, the ALJ accorded great weight to the medical opinion of State agency mental health consultant Renee McPherson-Salandy, Ph.D.[5] (*Id.*) The ALJ also pointed to Dr. McPherson-Salandy's

---

[4] The record shows that on November 1, 2016, Diana Davidson, PMHN-BC, a Florida licensed ARNP, prescribed an emotional support animal as part of Plaintiff's treatment after Plaintiff indicated he wanted his dog of eight years deemed an emotional support animal. (Tr. 326, 378.) Plaintiff also provided the following testimony regarding his "therapy dog" in response to the ALJ's questions during his hearing:
> Q: And[,] other than the medications[,] are there other things that you're doing at this time to manage the symptoms? Have they recommended any additional therapy or do you see a therapist?
> A: I also have a therapy dog so whenever I feel like I need to break down I can break down with my dog and she's there. She's there with me. She listens to me and you can even, [sic] we talk to each other. You can hear, I feel like she's talking to me and you can hear her like hum to me when I'm crying[,] she hums to me and it feels so comforting because it feels like she understands me. She understands my pain.

(Tr. 40-41.)

[5] Dr. McPherson-Salandy opined as follows:
[T]he claimant should be able to understand and remember both simple and detailed instructions; may have intermittent disturbances from mental impairments[,] but can follow two-three step commands and can persist and maintain attention and concentration for two hour increments sufficiently enough to complete an eight hour workday; may function best

observations that Plaintiff had "mild memory limitations, no history of inpatient psychiatric hospitalization, and [the] ability to perform activities of daily living." (*Id.*) The ALJ also accorded great weigh to State agency mental health consultant Nancy Hinkeldey, Ph.D., who, at the reconsideration level, affirmed Dr. McPherson-Salandy's opinion. (*Id.*) The ALJ concluded that:

> [T]he above residual functional capacity assessment is supported by the claimant's diagnoses of anxiety, depression, and PTSD, evidence that his mental health symptoms can be controlled with medication compliance and treatment, and the claimant's ability to perform a wide range of activities of daily living such as driving, going shopping in stores, and traveling with his family.

(*Id.*) The ALJ then determined that, based on Plaintiff's testimony, Plaintiff's earning records, and the testimony of the vocational expert ("VE"), Plaintiff was able to perform his past relevant work of cleaner II, construction worker II, and stucco mason, but could not perform self-employed work.[6] (*Id.*) The ALJ noted

---

in an environment with minimal social interaction with the general public and co-workers and a supportive management style; [and] may have mild adaptive limitations due to mental health signs and symptoms[,] but possesses the capacity to make reasonable decisions and adapt to routine changes in [the] workplace (Exhibit 2A).
(Tr. 21.)

[6] The ALJ found that Plaintiff could perform his past relevant work "as actually and generally performed" and noted that the VE testified that "an individual with the claimant's age, education, work history, and residual functional capacity would be able to perform these jobs." (Tr. 22.) The ALJ referred to the VE's testimony that Plaintiff "could not perform self-employment because it would require the claimant to market himself." (*Id.*) The ALJ also noted that she "asked if having a supportive supervisor [would be] a 'reasonable accommodation' in construction" and that the VE responded that "supervisors in construction are more tolerant of workers as long as they are doing their jobs." (*Id.*)

13

that "[t]his work does not require the performance of work-related activities precluded by" Plaintiff's RFC. (*Id.*) Thus, the ALJ concluded that Plaintiff was not disabled from January 1, 2015 through May 23, 2017. (Tr. 22.)

### C. Plaintiff's Need for a Service Animal[7]

Plaintiff claims that the ALJ improperly failed to incorporate his need for a service animal into the RFC finding and, since the VE failed to account for the need for a service animal, the vocational testimony cannot be substantial evidence supporting the ALJ's decision. (*See* Doc. 16 at 4, 9.) Specifically, Plaintiff argues that although the ALJ "acknowledged the evidence establishing Plaintiff's need for a service animal, Tr. 20-21, without challenging Ms. Davidson's judgment that Plaintiff needed it," the ALJ failed "to discuss its significance in terms of Plaintiff's work-related limitations as part of her RFC findings." (*Id.* at 8.) Thus, Plaintiff asks the Court to reverse the ALJ's decision and remand for further proceedings.

Defendant counters that substantial evidence supports the ALJ's decision where "the ALJ considered Plaintiff's condition as a whole and concluded that his severe impairments were not disabling." (Doc. 17 at 9.) Defendant also argues that "[i]n reaching this conclusion, the ALJ expressly noted that Plaintiff was given an emotional support dog, but implicitly determined that Plaintiff did not

---

[7] Service animal may be referred to as "emotional support dog" or "support dog" throughout.

14

need the dog in order to function in the workplace." (*Id.* at 9-10.) In analogizing Plaintiff's use of a support animal to a hand-held assistive device like a cane or a walker, Defendant claims that Plaintiff did not establish that he needed his emotional support dog at work, particularly where "the ALJ sufficiently accommodated Plaintiff's limitations in the RFC by restricting Plaintiff to an environment in which he could operate without an emotional support dog." (*Id.* at 12.) The court is unpersuaded by Defendant's arguments.

While there does not appear to be any Eleventh Circuit authority establishing a standard for incorporating a claimant's need for a service animal in a claimant's RFC assessment, some courts have found that "the use of a service dog must be medically necessary to be considered in an RFC assessment."[8] *See McGhee v. Berryhill*, 386 F. Supp. 3d 80, 87 (D. Mass. July 2, 2019) (citing *Santos v. Colvin*, No. 3:12-cv-05827-KLS, 2013 WL 5176846, at *2, *6 (W.D. Wash. Sept. 12, 2013) (finding a reversible error where the ALJ did not consider the vocational impact of plaintiff's use of a service animal when "at least some evidence in the record" showed that "plaintiff's use of a service dog [was]

---

[8] Although the issue has not been squarely addressed in this Circuit, in *Cook v. Comm'r of Soc. Sec.*, 8:16-cv-819-T-JSS, 2017 WL 2544875, *6 (M.D. Fla., June 13, 2017), the District Court found that the plaintiff failed to establish that his need for a service dog affected the RFC assessment where the "ALJ addressed Plaintiff's service dog within her decision and concluded that the record [was] inconsistent with a need for the service dog." Moreover, the Court noted that "the ALJ found that the need for a service dog [did] not result in any functional limitation" and "during the hearing, the VE affirmed that Plaintiff would be able to perform any of the jobs identified for Plaintiff with the service dog." *Cook*, 2017 WL 2544875 at *6.

15

medically necessary"); *Payano v. Colvin*, No. 2:15-cv-00294-RFB-GWF, 2017 WL 4778593, at *4 (D. Nev. Oct. 23, 2017) (finding it was a harmless error for the ALJ to omit the need for a service dog in the hypothetical question to the VE where the evidence failed to support that a service dog was necessary for Plaintiff to work)). Other courts have also found that the ALJ must consider the claimant's use of a service dog when the evidence shows that the service dog was medically prescribed or recommended. *See Renfro v. Colvin*, No. 14-cv-3015, 2015 WL 12868081, *13 (C.D. Ill. Oct. 21, 2015) (finding that the "ALJ's failure to address adequately the evidence regarding the use of the service dog [was] material" and noting that it was unclear "that a person could perform a cleaning job if her RFC required her to take a service dog with her to the job site"). Moreover,

> [a]bsent a prescription, courts are split on whether a letter recommending a service dog from a medical source is sufficient to show that the dog is medically necessary. *Compare Payano*, 2017 WL 4778593, at *4 (finding [a] letter from [a] psychiatrist recommending [a] service dog alone does not support an assessment that [a] dog is necessary for plaintiff to work), *with Santos*, 2013 WL 5176846, at *5 (remanding where [a] doctor provided [a] letter indicating that plaintiff required a service dog). The court in *Santos* suggested that a letter from a medical source may be superfluous when the record establishes that plaintiff's service dog "has been of significant benefit to him in terms of his mental health symptoms." 2013 WL 5176846, at *5 (finding the record contained evidence that [the] service dog had greatly reduced plaintiff's panic attacks and agoraphobia).

*McGehee*, 386 F. Supp. 3d at 88.

Here, although the ALJ acknowledged that Plaintiff used an emotional support dog (Tr. 20-21 (noting that Plaintiff was "undergoing therapy for his mental impairments, and was given an emotional support dog")), she failed to analyze Plaintiff's need for a support animal when assessing the RFC and in determining that Plaintiff could perform his prior jobs. The record reflects that Plaintiff's treatment provider, Ms. Davidson, prescribed an emotional support animal as part of Plaintiff's treatment.[9] (*See* Tr. 326; *see also* 378 (noting that Plaintiff's support dog helped him "keep calm in stressful situations" and had been "through everything" with him).) The record also reflects that Ms. Davidson determined that the service dog was medically necessary and specifically stated

---

[9] In a letter dated November 1, 2016, Ms. Davidson stated as follows:
Daniel Cruz is currently under my professional psychiatric care for treatment for mental illness defined by the DSM 5. I am a board certified psychiatric nurse practitioner and [I] am licensed to practice psychiatry in the state of Florida. His mental impairment substantially limits his major life activities. I have prescribed an emotional support animal as part of the treatment program developed for Daniel. The presence of this emotional support animal is necessary for Daniel Cruz [sic] mental health and well-being.
This animal (dog-Majesty) helps him cope with changes in surroundings with less anxiety/dysfunction, and helps h[im] remain calm when dealing with many people and with stressful situations. His emotional support animal also assists in regulating his moods, and without this animal, the patient would struggle with many aspects of daily life and could cause a relapse in his mental health condition.
In accordance with the Fair Housing Act, Daniel Cruz has a right to keep his emotional support animal living with him at his current residence.
In accordance with the Air Carrier Access Act (49 U.S.C. [§] 41702 and 14 C.F.R. [§] 382), Daniel Cruz has a right to have his emotional support animal accompany h[im] on any aircraft.
. . .
(Tr. 326.)

that without his support dog, Plaintiff "would struggle with many aspects of daily life and could . . . relapse in his mental health condition." (Tr. 326.)

While the record shows that Plaintiff was prescribed a service animal as part of his treatment program, which the ALJ acknowledged, it is unclear whether the ALJ considered and implicitly discounted this evidence in terms of Plaintiff's RFC and purported ability to perform his past jobs. *See Santos*, 2013 WL 5176846, *6 (finding that the ALJ committed a reversible error in failing to assess the vocational impact of the plaintiff's use of a service dog where there was some evidence in the record that "plaintiff's use of a service dog was medically necessary" and "that failure to accommodate the use thereof may have a significant adverse impact on the ability of plaintiff to function mentally, including in the workplace"); *see also Meek v. Astrue*, No. 3:08-cv-317-J-HTS, 2008 WL 4328227, *1 (M.D. Fla. Sept. 17, 2008) ("Although an ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision . . . . Rather, the judge must explain why significant probative evidence has been rejected.") (internal citations and quotation marks omitted).

Because there is evidence in the record indicating that Plaintiff's use of a service dog is medically necessary and is part of his treatment plan (Tr. 41, 326, 378), the undersigned finds that the ALJ's failure to explain why she rejected such probative evidence in assessing Plaintiff's RFC constitutes a reversible error. Therefore, this case will be remanded for further proceedings. In light of this conclusion, the Court need not address Plaintiff's remaining arguments. *See*

18

*Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008).

According, it is respectfully **ORDERED:**

1. The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to: (a) re-consider vocationally relevant evidence concerning Plaintiff's need for a service dog; (b) re-evaluate Plaintiff's RFC assessment; and (c) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2),* Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C § 2412.

**DONE and ORDERED** in Jacksonville, Florida, on September 10, 2019.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record